No. 25-10890

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

ERIC MCCUTCHAN; CENTER FOR INQUIRY, INCORPORATED,
*Plaintiffs – Appellants,*

v.

MARY LOUISE NICHOLSON, IN HER CAPACITY AS CLERK OF
TARRANT COUNTY, TEXAS; PHIL SORRELLS, IN HIS CAPACITY AS
DISTRICT ATTORNEY OF TARRANT COUNTY, TEXAS,
*Defendants – Appellees,*

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
*Intervenor Defendant – Appellee.*

On Appeal from the United States District Court
for the Northern District of Texas, USDC No. 4:24-CV-01039-O

(Hon. Charles O'Connor, United States District Judge)

## BRIEF OF AMERICAN HUMANIST ASSOCIATION AND
## INTERFAITH ALLIANCE FOUNDATION AS AMICI CURIAE IN
## SUPPORT OF NEITHER PARTY, SUPPORTING REVERSAL
## WITH LIMITED REMAND

Amitai Heller
American Humanist Association
1821 Jefferson Place NW
Washington, D.C. 20036
202-238-9088
aheller@americanhumanist.org

October 6, 2025

Courtney Miller
HWG LLP
1919 M Street NW, Eighth Floor
Washington, D.C. 20036
202-730-1300
cmiller@hwglaw.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 29(a) and 26.1, the American Humanist Association and the Interfaith Alliance Foundation hereby state that they have no parent corporations and that no publicly held company owns 10 percent or more of their stock.

Courtney Miller
*Counsel for Amici Curiae*

## STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rules 29.2 and 28.2.1, undersigned counsel for amici curiae certifies that the following persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellants**
Eric McCutchan
Center for Inquiry, Inc.

**Other Interested Party**
Center for Inquiry Austin

**Counsel for Plaintiffs-Appellants**
M. Scott Barnard
Madison M. Gafford

**Defendants-Appellees**
Mary Louise Nicholson—Clerk of Tarrant County, Texas
Phil Sorrells—District Attorney of Tarrant County, Texas

**Counsel for Defendants-Appellees**
Phil Sorrells
Stephen A. Lund
Katherine E. Owens

**Intervenor-Defendant-Appellee**
Ken Paxton—Attorney General of Texas

**Counsel for Intervenor-Defendant-Appellee**
Martin Arroyo, Jr.
Daniel M. Ortner

Ken Paxton
Brent Webster
Ralph Molina
James Lloyd
Kimberly Gdula
Mason Currah

**Amici Curiae**
American Humanist Association
Interfaith Alliance Foundation

**Counsel for Amici**
Amitai Heller
Courtney Miller

_____
Courtney Miller
*Counsel for Amici Curiae*

## RULE 29(a) STATEMENT

This brief is submitted under Federal Rule of Appellate Procedure 29(a) with the opposition of one party. Undersigned counsel for amici curiae certifies that this brief was not authored in whole or part by counsel for any of the parties; no party or party's counsel contributed money for the brief; and no one other than amici and their counsel have contributed money for this brief.

Courtney Miller
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................i

STATEMENT OF INTERESTED PERSONS.....................................ii

RULE 29(a) STATEMENT .....................................................iv

TABLE OF AUTHORITIES......................................................vi

STATEMENTS OF INTEREST.................................................1

SUMMARY OF ARGUMENT..................................................2

ARGUMENT......................................................................4

   I.  NON-THEISTIC RELIGIONS ARE COVERED BY THE
      RELIGION CLAUSE. ...................................................4

      A. The U.S. Supreme Court Has Long Held that the Religion
         Clause Covers Non-Theism. ....................................6

      B. Subsequent Supreme Court Precedent Reinforces the
         Inclusion of Non-Theistic Religions. ........................10

      C. A Theistic Requirement Would Divest Recognized
         Religions from the Religion Clause and Contravene Other
         Long-Standing Doctrine. .........................................14

   II.  HUMANISM, AT LEAST IN SOME CIRCUMSTANCES, IS A
      RELIGION UNDER THE CONSTITUTION. .............................23

      A. The American Humanist Movement Emerged from
         Religious Traditions, and Some Forms of Humanism
         Retain Elements of That Lineage. ..............................24

      B. At Least in Some Instances, Humanism Satisfies the
         Legal Definition of Religion......................................29

CONCLUSION ..................................................................33

CERTIFICATE OF RULE 32(G)(1) COMPLIANCE ............................34

CERTIFICATE OF SERVICE .................................................35

# TABLE OF AUTHORITIES

## Cases

*Africa v. Pennsylvania*,
   662 F.2d 1025 (3rd Cir. 1981). ........................................................ 13, 29

*Am. Legion v. Am. Humanist Ass'n*,
   588 U.S. 29 (2019). ..................................................................... 14

*Cruz v. Beto*,
   405 U.S. 319 (1972) ..................................................................... 14

*Ctr. for Inquiry, Inc. v. Marion Cir. Ct. Clerk*,
   758 F.3d 869 (7th Cir. 2014). ............................................................ 5

*Davis v. Beason*,
   133 U.S. 333 (1890). ...................................................................... 6

*Fellowship of Human. v. County of Alameda*,
   315 P.2d 394 (Cal. Dist. Ct. App. 1957)................................................ 31

*Frazee v. Ill. Dep't Emp. Sec.*,
   489 U.S. 829 (1989). .................................................................... 22

*Kaufman v. McCaughtry*,
   419 F.3d 678 (7th Cir. 2005). ............................................................ 6

*Kennedy v. Bremerton Sch. Dist.*,
   597 U.S. 507 (2022). .................................................................... 20

*McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*,
   No. 23-60494, 2025 LX 385718 (5th Cir. Sept. 9, 2025). .................... 23

*Murphy v. Collier*,
   587 U.S. 901 (2019) ..................................................................... 14

*Pelphrey v. Cobb County*,
   547 F.3d 1263 (11th Cir. 2008). ........................................................ 20

*Reynolds v. United States*,
   98 U.S. 145 (1878). ....................................................................... 6

*Roake v. Brumley*,
  No. 24-30706, 2025 LX 384113 (5th Cir. June 20, 2025)..................... 21

*Satanic Temple, Inc. v. City of Boston*,
  111 F.4th 156 (1st Cir. 2024). .............................................. 20

*Strayhorn v. Ethical Soc'y of Austin*,
  110 S.W.3d 458 (Tex. App. 2003)............................................ 13, 25, 30

*Thomas v. Rev. Bd. Ind. Emp't Sec. Dev.*,
  450 U.S. 707 (1981). ....................................................... 22

*Torcaso v. Watkins*,
  367 U.S. 488 (1961). ....................................................... 7, 9, 10, 14, 31

*United States v. Hoffman*,
  436 F.Supp. 3d 1272 (D. Ariz. 2020)........................................ 20

*United States v. Macintosh*,
  283 U.S. 605 (1931). ....................................................... 6

*United States v. Peterson*,
  No. 24-30043, 2025 LX 387378 (5th Cir. Aug. 27, 2025). .................... 31

*United States v. Seeger*,
  380 U.S. 163 (1965). ....................................................... 10, 11, 12, 29

*United States v. Welsh*,
  398 U.S. 333 (1970). ....................................................... 11, 12, 28

*Wallace v. Jaffree*,
  472 U.S. 38 (1985). ........................................................ 8

*Wash. Ethical Soc'y v. District of Columbia*,
  249 F.2d 127 (D.C. Cir. 1957). ............................................. 25, 31

*Watson v. Jones*,
  80 U.S. 679 (1981). ........................................................ 23

*Wisconsin v. Yoder*,
  406 U.S. 205 (1972). ....................................................... 12, 13

*Wright v. Honeywell Int'l, Inc.*,
   No. 24-30667, 2025 LX 371493 (5th Cir. Aug. 5, 2025). ..................... 12

**Statutes**

Tex. Fam. Code § 2.202. ............................................................. 2

**Other Authorities**

1 Paul Tillich, *Systematic Theology: Three Volumes in One* (1967)....... 18

*American Daoism in the 21st Century*, The Pluralism Project, Harvard
   Univ., https://pluralism.org/american-daoism-in-the-21st-century (last
   visited Oct. 3, 2025). ............................................................ 17

*Confucianism and Daoism Among Asian Americans*, Pew Research
   Center (Oct. 11, 2023), https://www.pewresearch.org/religion
   /2023/10/11/confucianism-and-daoism-among-asian-americans/........ 17

Donald Wayne Viney, *American Deism, Christianity, and the Age of
   Reason*, 31(2) Am. J. Theology & Phil. 83 (2010).......................... 19, 24

*Evolving Religious Civilization*, Reconstructing Judaism,
   https://www.reconstructingjudaism.org/evolving-religious-civilization/
   (last visited Oct. 3, 2025). ..................................................... 19

*Existence of a Higher Power in Unitarian Universalism*, Unitarian
   Universalist Ass'n, https://www.uua.org/beliefs/what-we-
   believe/higher-power (last visited Oct. 3, 2025).................................. 19

*Find a Community*, Society for Humanistic Judaism, https://shj.org/
   connect/find-a-community/ (last visited Oct. 3, 2025). ........................ 18

*Hindus*, Religious Landscape Study, Pew Research Ctr.,
   https://www.pewresearch.org/religious-landscape-study/religious-
   tradition/hindu/ (last visited Oct. 3, 2025)......................................... 16

*Humanism and Its Aspirations: Humanist Manifesto III*, AHA,
   https://americanhumanist.org/what-is-humanism/manifesto3/ (last
   visited Oct. 3, 2025)............................................................. 26

*Humanist Manifesto I*, AHA, https://americanhumanist.org/what-is-humanism/manifesto1/ (last visited Oct. 3, 2025). .............................. 25

Jacob Ausubel, Gregory A. Smith & Alan Cooperman*, Denominational Switching Among U.S. Jews: Reform Judaism Has Gained, Conservative Judaism Has Lost*, Pew Research Center (June 22, 2021), https://tinyurl.com/cj7rbr5p. ...................................................... 22

*Jain Population by Country 2025*, World Population Rev., https://worldpopulationreview.com/country-rankings/jain-population-by-country (last visited Oct. 3, 2025). ..................................................... 16

Jeffrey Long, *Jainism: Key Themes*, 5(9) Religion Compass 501 (2011) ................................................................................................. 16

John Shelby Spong, *Bishop Spong on God*, Progressive Christianity: Pathways for Your Evolving Faith (Dec. 15, 2014), https://progressivechristianity.org/resource/bishop-spong-on-god-2/. ............ 18

Joseph A. Adler, Professor, Kenyon College, Presentation at Toward a Reasonable World: The Heritage of Western Humanism, Skepticism, and Freethought: The Heritage of Non-Theistic Belief in China (Sept. 2011). ................................................................................................. 17

Leigh Eric Schmidt, *The Church of Saint Thomas Paine: A Religious History of American Secularism* (2021) ................................................ 24

Matthew T. Kapstein, *The Buddhist Refusal of Theism*, 52(1) Diogenes 61 (2005) ................................................................................................ 15

*Mission and Vision*, Soc'y for Humanistic Judaism, https://shj.org/about-shj/mission-and-vision/ (last visited Oct. 3, 2025). .............................. 18

Oral Argument Vol. 1, *Torcaso v. Watkins*, 367 U.S. 488 (1961) (No. 373). ............................................................................................. 9, 31

Oral Argument Vol. 2, *Torcaso v. Watkins*, 367 U.S. 488 (1961) (No. 373). .................................................................................. 8, 9, 10, 31

*Our History*, AHA, https://americanhumanist.org/about/our-history/ (last visited Oct. 2, 2025). .................................................................... 25

Rabbi Doug Heifetz, *What Is Reconstructionist Judaism? The CORE Answer*, Reconstructing Judaism (Nov. 16, 2016). .............................. 19

Randall E. Otto, *The Doctrine of God in the Theology of Paul Tillich*, 52(2) Westminster Theological J. 303 (1990)....................................... 21

Richard P. Hayes, *Principled Atheism in the Buddhist Scholastic Tradition*, 16 J. Indian Phil. 5 (1988)................................................... 15

*Shared Values*, Unitarian Universalist Ass'n, https://www.uua.org/ beliefs/shared-values (last visited Oct. 3, 2025). ................................. 19

Syama Allard, *Why Hinduism Isn't Only a Theistic Tradition*, Hindu Am. Found. (June 30, 2022), https://www.hinduamerican.org/blog/ why-hinduism-isnt-only-a-theistic-tradition. ..................................... 16

*The Chinese Rites Controversy: Its History and Meaning* (D. E. Mungello, ed. 1994). .............................................................................. 17

*Theravada Buddhists in the World*, Dhamma Wiki, https://tinyurl.com/ye22jrak (last visited Oct. 3, 2025). ...................... 15

*UUA Membership Statistics, 1961–2024*, Unitarian Universalist Ass'n, https://www.uua.org/data/demographics/uua-statistics (last visited Oct. 3, 2025). ........................................................................ 19

*What Is Ethical Humanism?*, Am. Ethical Union, https://aeu.org/who-we-are/ethical-humanism/ (last visited Oct. 2, 2025)......................... 25

*Who Is a Rabbi?*, Central Conference of American Rabbis, https:// www.ccarnet.org/ccar-responsa/nyp-no-5759-3/ (last visited Oct. 3, 2025)....................................................................................................... 22

William E. Kaufman, *Mordecai M. Kaplan and Process Theology: Metaphysical and Pragmatic Perspectives*, 20(4) Process Stud. 192 (1991)..................................................................................................... 19

Williams Herbrechtsmeier, *Buddhism and the Definition of Religion: One More Time*, 32(1) J. Sci. Study Religion 1 (1993). ....................... 15

## STATEMENTS OF INTEREST

Founded in 1941, the American Humanist Association ("AHA") is the nation's oldest and largest Humanist organization. AHA is a national nonprofit membership organization based in Washington, D.C., with over 235 local chapters and affiliates in 45 states and the District of Columbia, and over 34,000 members and supporters. AHA's adjunct organization, the Humanist Society, is a religious 501(c)(3) organization that trains and certifies Humanist clergy.

Interfaith Alliance Foundation is a network of people of diverse faiths and beliefs from across the country working together to build a resilient democracy and fulfill America's promise of religious freedom and civil rights not just for some, but for all. Since its founding in 1994, Interfaith Alliance has worked tirelessly to defend the values that define this nation—values of inclusion, dignity, and the protection of each individual's right to believe as they choose. It strives to build a resilient, inclusive democracy, which respects the inherent dignity of all people, affords each person the freedoms of belief and religious practice, and guarantees that all have the opportunity to thrive.

## SUMMARY OF ARGUMENT

Amici agree with Appellants as to the merits of their case. Texas Family Code § 2.202 restricts the government function of solemnizing marriages to judges and certain persons affiliated with religious organizations, thereby excluding celebrants of organizations that are not religious. This violates the Constitution. The merits, however, are not before this Court. Before dismissing Appellants' claims for lack of standing, the district court answered questions unnecessary to the case. It concluded that only theistic religions are encompassed by the Religion Clause, and as a result, that Humanism cannot be a religion. Both conclusions flatly contradict Supreme Court precedent and decades of lower court decisions in its wake.

A belief in God is not required for a belief system to be encompassed by the Religion Clause. Decades ago, the U.S. Supreme Court expressly rejected the idea that non-theistic religions are outside of its scope. Shortly thereafter, it adopted a functional definition of religion that centers on the role of the belief system in the life of the adherent. Non-theistic religions—including Humanism—can meet that definition. This is true even if adherents reject the colloquial label of religion.

In fact, it *must* be true to ensure equal treatment under the law. Upholding the district court's conclusions would not only inject the judiciary into theological questions that it lacks the authority and competence to adjudicate, but would also create untenable free-exercise and establishment problems. Most notably, those conclusions would divest from the Religion Clause millions of Americans who are nearly identically situated to millions of others—except that their deeply and sincerely held convictions do not arise from a belief in God. Either Humanism is a religion, at least in some circumstances, or current free-exercise jurisprudence is discriminatory and unconstitutional. Equality demands that the type of convictions currently protected—regardless of their source—are available to all or available to none.

Amici support Appellants as to both their standing and the merits, and thus support a remand limited to proceeding on the merits. We disagree, however, that non-theistic religions, including Humanism, cannot be religions. As a result, we file in support of neither party. Whatever the Court's disposition, we urge it to clarify that non-theistic religions, including Humanism, are within the ambit of the Religion Clause.

# ARGUMENT

## I.   NON-THEISTIC RELIGIONS ARE COVERED BY THE RELIGION CLAUSE.

At the outset, amici set out some definitional understandings: "Theism" is commonly understood as a belief in a God—or, more rarely, gods—a divine being, typically personified, who functions in a creator role and intervenes in the human world. Some religions are "theistic" in that this belief is central to their metaphysical and epistemological framework. Other religions are "non-theistic" in that they derive their authority and ethical imperatives from a metaphysical and epistemological framework that does not posit or require a belief in such a God. As explained below, non-theistic religions can be home to atheists, agnostics, pantheists, and even some who believe in a traditional God.

Non-theistic religions are covered by the Religion Clause, and the district court erred in concluding otherwise. After interpreting U.S. Supreme Court precedent as "provid[ing] both theistic and seemingly non-theistic definitions" of religion (ROA.281), the district court concluded that theism is a necessary component of religion and, impliedly, that Humanism therefore cannot be one (ROA.281-82).

Preliminarily, we acknowledge that the latter conclusion is vague. This appears to be a product of the Texas Attorney General's assertion that Center for Inquiry, Inc. ("CFI") is "a religious organization" and "a religion" (ROA.278-79 & n.3)—which prompted the court to ask, "[i]s CFI a religion?" and to conclude that it is neither (ROA.281). But this framing is conceptually incoherent. CFI is not, and cannot be, a religion. CFI might be a religious organization—but answering that question is not necessary to resolve standing, jurisdiction, or the merits.[1]

More fundamentally, the district court's conclusions about religion contradict decades of precedent, would divest many recognized religions from the safeguards of the Religion Clause, and would force the judiciary to resolve questions that it lacks the competence and authority to address. This Court should correct the district court's errors.

---

[1] In a similar case, the Seventh Circuit found that a justiciable controversy existed because the state would allow CFI's celebrants to solemnize marriages if CFI would *call* itself a religion," but CFI "refuse[d] to accept the religious organization label." *Ctr. for Inquiry, Inc. v. Marion Cir. Ct. Clerk*, 758 F.3d 869, 871 n.† & 872 (7th Cir. 2014). The same logic applies here. The Parties disagree about whether Humanism is a religion, but the Court need not answer that question to decide whether Appellants have standing or whether Texas's statute is unconstitutional. Moreover, at least at the 12(b) phase, it would be inappropriate for CFI to be considered a religious organization when it denies as much in its pleadings.

5

### A.     The U.S. Supreme Court Has Long Held that the Religion Clause Covers Non-Theism.

The U.S. Supreme Court has long adopted, for Constitutional purposes, "a broad definition of 'religion' that includes non-theistic and atheistic beliefs, as well as theistic ones." *Kaufman v. McCaughtry*, 419 F.3d 678, 682 (7th Cir. 2005). Although the early cases cited by the district court evince a theistic understanding of religion, the definitional question was not before the Court. Those cases examined free-exercise claims by adherents of forms of Christianity, a theistic religion, and the Court's descriptions of religion were made in the context of holding that even a belief in God did not exempt those religious believers from government action.[2]

---

[2]     The definition in *Macintosh* was from the dissenting opinion, which couched its analysis in a discussion of "religious or conscientious" rights. *United States v. Macintosh*, 283 U.S. 605, 631-35 (1931) (Hughes, J., dissenting). In the other two cases, the Court examined state action against polygamy, and offered its statements describing religion in explaining that the Religion Clause protects "beliefs" but not "practices." *Reynolds v. United States*, 98 U.S. 145, 166 (1878) ("Laws are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices."); *Davis v. Beason*, 133 U.S. 333, 342 (1890) ("It was never intended or supposed that the [First] [A]mendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society."). Current free-exercise jurisprudence is a far cry from that expressed in these opinions.

Roughly 65 years ago, the U.S. Supreme Court for the first time contemplated whether theism is a condition of religion under the Religion Clause. The sole opinion—joined by 7 justices, with 2 concurring in the result—concluded that it is not. *See Torcaso v. Watkins*, 367 U.S. 488 (1961). Specifically, requiring state officials to declare a belief in God as part of their oath of office "unconstitutionally invades . . . freedom of belief and religion." *Id.* at 496. In reaching this conclusion, the Court "repeat[ed] and . . . reaffirm[ed]" well-established First Amendment principles, including that the government cannot "aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." *Id.* at 495. The Court then listed a sample of "religions in this country which do not teach what would generally be considered a belief in the existence of God." *Id.* at 495 n.11.

The district court's treatment of *Torcaso* is flawed. First, the *Torcaso* Court's analysis was expressly grounded in the Religion Clause—not in the Oaths Clause of Article VI, as the district court wrote. *See id.* at 489 n.1 (noting that the Court did not consider the Oaths Clause because it reached its decision on other grounds); *id.* at 495-96 (applying First Amendment and Equal Protection principles). *Compare*

Oral Argument Vol. 2 at 00:43:53-00:46:06, *Torcaso*, 367 U.S. 488, [hereinafter Oral Argument 2], https://www.oyez.org/cases/1960/373 (Torcaso's counsel arguing that Article VI is incorporated as to the states), *with id.* at 01:28:09-1:30:25 (Government disagreeing). More fundamentally, *Torcaso* does not reflect the Court "revers[ing] course" from a "theistic definition." (ROA.280.) It was simply the first case to ask whether the word "religion" in the Religion Clause necessitates a belief in God. *Accord Wallace v. Jaffree*, 472 U.S. 38, 52-53 (1985) (observing that early understandings of religion had not "been examined in the crucible of litigation"). Finally, *Torcaso* is not limited to atheism. Although the plaintiff was an atheist, requiring a belief in God infringes, by definition, agnostic and other non-theistic beliefs as well.

The oral argument in *Torcaso* makes clear that the Court was assessing atheism and non-theism for the first time. It is replete with discussion of both the existence of non-theistic religions and the implications of excluding such religions, as well as atheism and agnosticism, from the scope of the Religion Clause. For example:

- *Torcaso's Counsel*: "Agnostics are barred [from office due to the oath] as well because agnostics can't say they believe in God. Agnostics have some doubts. They don't know. And . . . members of

non-theistic religions are barred." Oral Argument 2, 00:33:09-00:33:21.

- *Justice Stewart*: "I'm asking out of ignorance, really, but . . . doesn't religion involve a belief in a supernatural being or more than one supernatural being . . . or gods?" *Torcaso's Counsel*: "I don't think . . . so. I think that's a common impression. But if we were to accept that, we would have to exclude from the compass of religion, the literally hundreds of millions of persons who are of the Buddhist faith or the Confucius faiths, as well as the hundreds of thousands who are members of the Ethical Culture Society . . . ." Oral Argument Vol. 1 at 00:03:35-00:04:11, *Torcaso*, 367 U.S. 488 [hereinafter Oral Argument 1].

- *Torcaso's Counsel*: "[I]f the First Amendment bars a state from preferring a particular religion over other religions . . . . [and if] the term 'religion,' as used in the First Amendment . . . [includes] non-theistic religions, then I think it follows clearly that . . . [requiring state officials to declare a belief in God] is a preference of certain religions over others." Oral Argument 2, 00:05:42-00:06:16.

The Court was clearly focused on these issues. Moreover, Torcaso's counsel explained that a non-theistic understanding of religion existed at our country's founding. He read a quote from James Iredell at the North Carolina Convention—which the Court included in its opinion—that referenced "pagans" as encompassed by Article VI. Oral Argument 2, 00:04:50-00:05:02; *Torcaso*, 367 at 495 n.10. Although paganism has referenced different things over time, it is typically considered pantheistic, and thus non-theistic, because it centers the divine in nature rather than in personified deities outside of the natural world. Torcaso's

counsel also argued that the preamble to the Virginia Statute of Religious Liberty, on which the First Amendment was based, illustrated that "the First Amendment—in the free exercise as well as in the establishment provision—encompasses . . . non-theistic religion as well as [theistic] religion." Oral Argument 2, 00:15:55-00:16:04. He then stated: "[T]he Court need not go any further than that. . . . [But] I would go further and say it encompasses the denial of the existence of a God as well." Oral Argument 2, 0016:05-00:16:13.

The *Torcaso* Court <u>did</u> go further. It held that the Religion Clause encompasses not only non-theistic religions but also beliefs that deny the existence of God. *Torcaso*, 367 at 495-96. *Torcaso* thus controls this case on the question of whether non-theistic religions are within the ambit of the Religion Clause: They are.

### B.    Subsequent Supreme Court Precedent Reinforces the Inclusion of Non-Theistic Religions.

Subsequent precedent—*Seeger*, *Welsh*, and *Yoder*—is consistent with *Torcaso* and reinforces the definition of religion as encompassing non-theism. In *Seeger* and *Welsh*, the Supreme Court addressed the constitutionality of Congress's religious exemption to the military draft. *United States v. Seeger*, 380 U.S. 163 (1965); *United States v. Welsh*, 398

U.S. 333 (1970). The statute defined "religious" in a way that required a belief in a "Supreme Being." To avoid finding it unconstitutional in that it excluded religions that do not adopt a traditional belief in God, the Court interpreted it to apply more broadly: to a "sincere and meaningful belief [that] occupies in the life of its possessor a place parallel to that filled by [an orthodox] God." *Seeger*, 380 U.S. at 176. Beliefs that meet this test <u>are</u>, by legal definition, religious—and are not "'essentially political, sociological, or philosophical' [views] . . . . [or] a 'merely personal moral code.'" *Welsh*, 398 U.S. at 343 (citing *Seeger*, 380 U.S. at 172).

The Court thus articulated a functional definition of religion: A belief system is a religion—whether its source and content are ethical, spiritual, supernatural, or "religious" in the traditional sense—if it *functions* as described. This is true whether or not the adherent (or anyone else) understands the beliefs to be religious. The adherents in *Seeger* and *Welsh* did not. *See id.* at 337, 340. The Court's definition unquestionably encompasses non-theism.

It bears emphasizing that this definition is a Constitutional one. The Supreme Court interpreted the statutory language of the military draft exemption *to avoid unconstitutionality*. That means that the test it

11

articulated is the Court's understanding of what "religion" means under the Constitution. *Contra Wright v. Honeywell Int'l, Inc.*, No. 24-30667, 2025 LX 371493, at *5 n.3 (5th Cir. Aug. 5, 2025) (suggesting that *Seeger* and *Welsh* did not answer this question). Even Justice Harlan—though reproaching the Court for exceeding the limits of the canon of constitutional avoidance—signed onto the majority's test, considering it required by the Religion Clause. *Welsh*, 398 U.S. at 354-56 (Harlan, J., concurring); *id.* at 345 ("I . . . adopt the test announced by [the majority], not as a matter of statutory construction, but as the touchstone for salvaging a congressional policy of long standing that would otherwise have to be nullified.").

Finally, *Yoder*—which was decided only eighteen months after *Welsh*—does not deviate from the above. *Yoder* remarked that the "philosophical and personal" views of Thoreau do not fall within the Religion Clause. *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972). But that just restates *Seeger* and *Welsh*, which maintained that "'political, sociological, or *philosophical*' [views] . . . . [or] a '*merely personal* moral code'" are not religious under the Constitution. *Welsh*, 398 U.S. at 343 (citing *Seeger*, 380 U.S. at 172) (emphases added); *see Strayhorn v.*

*Ethical Soc'y of Austin*, 110 S.W.3d 458, 467 (Tex. App. 2003). *Yoder* does not articulate a different standard or suggest a theistic definition of religion, as the district court wrote. Indeed, *Yoder* did not examine whether the Amish faith is a religion at all. It examined whether "the way of life" burdened by the state's compulsory-education law was "rooted" in the Amish religion. *Yoder*, 406 U.S. at 215.

In sum: The Supreme Court has not deviated from the conclusion clearly expressed in *Torcaso* that the Religion Clause encompasses non-theistic religions. In fact, *Seeger* and *Welsh* gave further substance to the Constitutional meaning of religion by crafting a functional definition that rejects theism as a necessary component. Courts across the country, including this one, have understood this precedent to embrace non-theism. *See, e.g.*, *Africa v. Pennsylvania*, 662 F.2d 1025, 1032 (3rd Cir. 1981) ("Drawing upon [*Seeger*, *Welsh*, and *Torcaso*], a number of lower federal courts have adopted a broad, non-theistic approach to the definition-of-religion question.").

### C.  A Theistic Requirement Would Divest Recognized Religions from the Religion Clause and Contravene Other Long-Standing Doctrine.

Many well-established religious traditions—including Buddhism, Jainism, Daoism, Confucianism, Unitarian Universalism, some forms of Hinduism, and branches of Judaism—are non-theistic. By requiring theism as a criterion for religious recognition, the district court's decision would place these religions outside the safeguards of the Religion Clause—revoking both free-exercise protection for the millions of Americans who adhere to these religions and establishment protection for everyone else. In some instances, it would force courts into theological determinations that they are neither qualified nor permitted to make. The implications of the district court's ruling are grave and far-reaching.

Buddhism is, perhaps, the largest and most familiar religion that would be divested from the Religion Clause under the district court's ruling. Until now, there has been little reason to question whether Buddhism is a religion for legal purposes.[3] However, while sectarian

---

[3]     Numerous Supreme Court cases affirm Buddhism as a religion. *See, e.g.*, *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 62 (2019); *Murphy v. Collier*, 587 U.S. 901, 902 (2019); *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Torcaso*, 367 U.S. at 495 n.11.

traditions within Buddhism are diverse, primary schools of Buddhist thought do not teach the existence of a God or gods. The orthodox view of Theravada Buddhism, a school with approximately 230 million followers worldwide and 2.4 million Americans, is that "the Buddha did not encourage spiritism, but rather a rigorous method of practice that would lead to insight and the release from suffering."[4] While some sects make a place for theistic considerations, Buddhism largely "remains uninterested in the matter of whether or not God is a part of our existential problem, while at the same time it sees no requirement for theistic belief in its formulation of the solution."[5] In fact, "Indian Buddhists consistently defend[] the position that belief in an eternal creator god who superintends his creation and looks after the concerns of his creatures is a distraction from the central task of the religious life."[6] The District Court's assertion that religion must be theistic is thus

---

[4]     Williams Herbrechtsmeier, *Buddhism and the Definition of Religion: One More Time*, 32(1) J. Sci. Study Religion 1 (1993); *Theravada Buddhists in the World*, Dhamma Wiki, https://tinyurl.com/ye22jrak (last visited Oct. 3, 2025).

[5]     Matthew T. Kapstein, *The Buddhist Refusal of Theism*, 52(1) Diogenes 61, 62 (2005).

[6]     Richard P. Hayes, *Principled Atheism in the Buddhist Scholastic Tradition*, 16 J. Indian Phil. 5 (1988).

irreconcilable with a historical, legal, and cultural understanding of Buddhism as a religion.

Additional non-Abrahamic religious traditions are either non-theistic, have non-theistic denominations, or understand God in a manner that is so different from the Abrahamic understanding that defining them as theistic would be suspect. Hinduism, a religion embraced by 1% of American adults, "encompasses a very wide range of traditions, including not only theistic, but non-theistic ones."[7] Jainism, a religion practiced by nearly 100,000 Americans and over 6 million people worldwide,[8] is non-theistic because it does not embrace a creator god and views the world through a perpetual cosmic cycle with no beginning or end.[9] Likewise, Daoism and Confucianism—indigenous Chinese religions

---

[7] Syama Allard, *Why Hinduism Isn't Only a Theistic Tradition*, Hindu Am. Found. (June 30, 2022), https://www.hinduamerican.org/blog/why-hinduism-isnt-only-a-theistic-tradition; *Hindus*, Religious Landscape Study, Pew Research Ctr., https://www.pewresearch.org/religious-landscape-study/religious-tradition/hindu/ (last visited Oct. 3, 2025).

[8] *Jain Population by Country 2025*, World Population Rev., https://worldpopulationreview.com/country-rankings/jain-population-by-country (last visited Oct. 3, 2025).

[9] Jeffrey Long, *Jainism: Key Themes*, 5(9) Religion Compass 501, 502 (2011).

followed by at least tens of thousands of Americans and millions worldwide[10]—are non-theistic traditions that have historically proved so inscrutable to the Abrahamic worldview that their very religiosity was at the center of a three-centuries-long rift between Jesuits, Dominicans, and Franciscans known as the Chinese Rites Controversy.[11]

Conditioning religious recognition on theism would even divest some Abrahamic denominations from the Religion Clause. For example, Christians whose views align with leaders like preeminent Christian theologian Paul Tillich or Episcopalian Bishop John Shelby Spong, could possibly be excluded. To Dr. Tillich, God existed beyond theism: "God does not exist. He is being-itself beyond essence and existence. Therefore,

---

[10]    *See Confucianism and Daoism Among Asian Americans*, Pew Research Center (Oct. 11, 2023), https://www.pewresearch.org/religion/2023/10/11/confucianism-and-daoism-among-asian-americans/;
*American Daoism in the 21st Century*, The Pluralism Project, Harvard Univ., https://pluralism.org/american-daoism-in-the-21st-century (last visited Oct. 3, 2025).

[11]    Joseph A. Adler, Professor, Kenyon College, Presentation at Toward a Reasonable World: The Heritage of Western Humanism, Skepticism, and Freethought: The Heritage of Non-Theistic Belief in China (Sept. 2011); *The Chinese Rites Controversy: Its History and Meaning* (D. E. Mungello, ed. 1994).

to argue that God exists is to deny him."[12] More recently, Bishop Spong

described his view of God in these terms:

> If the word "God" can be understood to refer, not to a being,
> but to the Ground of Being in which everything that exists is
> ultimately rooted, but which comes to self-consciousness only
> in human beings, then the only way we can worship that
> which we call God is by finding the courage to be all that each
> of us can be, and then by allowing, indeed encouraging, others
> to be all that they can be.[13]

Similarly, Humanistic Judaism—which has approximately 30

congregations across the United States—is an explicitly non-theistic form

of Judaism.[14] Adherents root their lives in the practice of Judaism but

adopt a non-theistic worldview.[15] Reconstructionist Judaism—a

denomination that emerged in the 1920s, led by theologian Mordechai

Kaplan—would also be excluded. With over 100 synagogues and 50,000

---

[12]    1 Paul Tillich, *Systematic Theology: Three Volumes in One* 205
(1967).

[13]    John Shelby Spong, *Bishop Spong on God*, Progressive
Christianity: Pathways for Your Evolving Faith (Dec. 15, 2014), https://
progressivechristianity.org/resource/bishop-spong-on-god-2/.

[14]    *Mission and Vision*, Soc'y for Humanistic Judaism, https://shj.org/
about-shj/mission-and-vision/ (last visited Oct. 3, 2025); *Find a
Community*, Society for Humanistic Judaism, https://shj.org/
connect/find-a-community/ (last visited Oct. 3, 2025).

[15]    *Mission and Vision*, *supra* note 14.

congregants, it is one of the major denominations of the Jewish religion.[16]

Reconstructionist doctrine *does* assert a belief in god, but that god is not

a being and is void of supernatural abilities.[17]

Even Unitarian Universalism—a religion with Christian roots that

precedes our country's founding, counted Thomas Jefferson as a follower,

and currently includes 130,000 Americans[18]—would be excluded. While

some Unitarian Universalists believe in God, theism is not a core part of

the theology.[19] Rather, Unitarian Universalists unite their religion

around six Shared Values that are centered on love.[20] Despite this non-

---

[16]    Rabbi Doug Heifetz, *What Is Reconstructionist Judaism? The CORE Answer*, Reconstructing Judaism (Nov. 16, 2016).

[17]    William E. Kaufman, *Mordecai M. Kaplan and Process Theology: Metaphysical and Pragmatic Perspectives*, 20(4) Process Stud. 192 (1991); *see also Evolving Religious Civilization*, Reconstructing Judaism, https://www.reconstructingjudaism.org/evolving-religious-civilization/ (last visited Oct. 3, 2025).

[18]    *Shared Values*, Unitarian Universalist Ass'n, https://www.uua.org/ beliefs/shared-values (last visited Oct. 3, 2025); *UUA Membership Statistics, 1961–2024*, Unitarian Universalist Ass'n, https://www.uua. org/data/demographics/uua-statistics (last visited Oct. 3, 2025); Donald Wayne Viney, *American Deism, Christianity, and the Age of Reason*, 31(2) Am. J. Theology & Phil. 83, 83, 94 (2010).

[19]    *Existence of a Higher Power in Unitarian Universalism*, Unitarian Universalist Ass'n, https://www.uua.org/beliefs/what-we-believe/higher-power (last visited Oct. 3, 2025).

[20]    *Shared Values*, *supra* note 18.

theistic stance, no United States court has ever doubted the religious nature of Unitarian Universalism. *See, e.g.*, *Satanic Temple, Inc. v. City of Boston*, 111 F.4th 156, 176 (1st Cir. 2024); *Pelphrey v. Cobb County*, 547 F.3d 1263, 1266 (11th Cir. 2008); *United States v. Hoffman*, 436 F.Supp. 3d 1272, 1277 (D. Ariz. 2020).

Consider, then, the implications of the district court's ruling that theism is a condition for religion. For one, the commonly-recognized religions described above—and likely many more—would be divested from the Religion Clause. This means that adherents of these religions would no longer possess free-exercise rights, <u>and</u> that the government could take actions that would unquestionably be establishment violations if these belief systems were considered religions. Schools, for example, could require students to chant Buddhist or Hindu sutras, even though they are prohibited from coercing Christian prayer. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537-42 (2022) (upholding the principle that coercing student prayer is unconstitutional). They could post Unitarian Universalism's six Shared Values, even though posting the Ten Commandments is "plainly unconstitutional." *Roake v. Brumley*, No. 24-30706, 2025 LX 384113, at *59, *62 (5th Cir. June 20, 2025)

(examining the question under both *Kennedy* and prior Supreme Court decisions).

Additionally, in some instances, deciding *whether* a given belief system is theistic would contravene the long-standing doctrine forbidding the judiciary from deciding religious questions. For example, to expect courts to resolve the true nature of Taoist and Confucianist religious qualification, when the resolution of that question took the Roman Catholic Church nearly 300 years of canonical discourse, requires an almost theistic view of judicial competence. Similarly, are the conceptions of God espoused by the Christian leaders discussed above theistic or non-theistic? The district court's ruling requires the resolution of this question, when a consensus on such matters cannot even be made within the Christian faith tradition.[21] *See, e.g.*, *Thomas v. Rev. Bd. Ind. Emp't Sec. Dev.*, 450 U.S. 707, 715-16 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or his

---

[21]    *See* Randall E. Otto, *The Doctrine of God in the Theology of Paul Tillich*, 52(2) Westminster Theological J. 303 (1990) ("That [the] question ['Is Tillich a theist?'] has been answered with every conceivable reply only serves to demonstrate the ambiguity that lies at the heart of Paul Tillich's thought. He has been variously described as a theist, a deist, a pantheist, a panentheist, a metaphysician, a mystic, an atheist, and a humanist.").

fellow worker more correctly perceived the commands of their common faith."). In fact, some non-theistic religions defer to individual choice as to a belief in God. Requiring theism would thus infringe a core tenet of those religions—i.e., that adherents can choose whether to believe in God—as well as the principle that beliefs need not be shared to receive Constitutional protection. *See, e.g.*, *Frazee v. Ill. Dep't Emp. Sec.*, 489 U.S. 829, 834-35 (1989) ("[T]he Free Exercise Clause does not demand adherence to a tenet or dogma of an established religious sect.").

Further, excluding some non-theistic religious denominations would contravene the church autonomy doctrine. Reform Judaism, America's largest Jewish denomination,[22] recognizes non-theistic Jews. According to the highest authority within American Reform Judaism, "[a]lthough we have our religious differences with Humanistic Judaism, we have no reason to doubt the Jewishness or the Judaic sincerity of those who practice it."[23] Under the district court's ruling, then, a Jewish

---

[22]    Jacob Ausubel, Gregory A. Smith & Alan Cooperman, *Denominational Switching Among U.S. Jews: Reform Judaism Has Gained, Conservative Judaism Has Lost*, Pew Research Center (June 22, 2021), https://tinyurl.com/cj7rbr5p.

[23]    *Who Is a Rabbi?*, Central Conference of American Rabbis, https://www.ccarnet.org/ccar-responsa/nyp-no-5759-3/ (last visited Oct. 3, 2025).

denomination, that is recognized as Jewish by a leading authority on American Judaism, would not be entitled to religious recognition in the United States. This is not only illogical but also flatly contradicts the church autonomy doctrine, which unequivocally bars the judiciary from interpreting religious doctrines, membership, and the identification of the "true church." *McRaney v. N. Am. Mission Bd. of the S. Baptist Convention, Inc.*, No. 23-60494, 2025 LX 385718, at *14 (5th Cir. Sept. 9, 2025); *accord Watson v. Jones*, 80 U.S. 679, 732 (1981).

Adopting a theistic definition of religion for purposes of the Religion Clause is fundamentally unworkable. It is at odds with the widespread acceptance of some religions, which have millions of adherents in the United States. And applying it would require courts to wade into the forbidden realm of religious issues and church autonomy—areas where the secular judiciary has little competence and no authority.

## II.    HUMANISM, AT LEAST IN SOME CIRCUMSTANCES, IS A RELIGION UNDER THE CONSTITUTION.

Another non-theistic belief system that would be excluded from the Religion Clause under the district court's definition—and one that the court impliedly concluded is not a religion—is Humanism. Excluding it overlooks the history of Humanism, legal precedent, and reasoned

analysis that, at least in some circumstances, Humanism satisfies the definition of religion under the First Amendment.

## A. The American Humanist Movement Emerged from Religious Traditions, and Some Forms of Humanism Retain Elements of That Lineage.

American Humanism emerged from a lineage of non-traditional religious movements. At the country's founding, deists—based on their own reasoning, as opposed to revelation or scripture—posited the existence of a non-interventionalist God.[24] Despite some people's view that deism was heretical and atheistic, many of the founding fathers, including Thomas Jefferson, Thomas Paine, and Benjamin Franklin, held deistic views.[25] As deism's influence waned, other, even less theistic religions came to the fore. One such group was the Religion of Humanity, which was inspired by the philosophy of Auguste Comte and treated Thomas Paine as a kind of patron saint.[26] In the 1870's, the Ethical Culture movement formed, on the basis of the humanistic teachings of

---

[24]    Viney, *supra* note 18, at 85.

[25]    *Id.* at 83.

[26]    *See generally* Leigh Eric Schmidt, *The Church of Saint Thomas Paine: A Religious History of American Secularism* (2021).

Felix Adler, who advocated for a religion based on "deed not creed."[27] Congregations known as Ethical Societies remain active across the United States and have been uniformly adjudicated as religious. *See, e.g.*, *Wash. Ethical Soc'y v. District of Columbia*, 249 F.2d 127 (D.C. Cir. 1957); *Strayhorn*, 110 S.W.3d at 472.

American Humanism became formalized through the Humanist Manifesto I, a document signed in 1933 largely by prominent clergy and scholars of religion and philosophy.[28] Two signatories—Curtis Reese and John Dietrich—were Unitarian Universalist ministers with large congregations, who later founded amicus AHA.[29] The Manifesto explicitly articulated Humanism as a new type of religious movement,[30] reflecting its emergence from the religious trajectories of the deistic and nontheistic movements of the eighteen and nineteenth centuries.

---

[27]    *What Is Ethical Humanism?*, Am. Ethical Union, https://aeu.org/who-we-are/ethical-humanism/ (last visited Oct. 2, 2025).

[28]    *Humanist Manifesto I*, AHA, https://americanhumanist.org/what-is-humanism/manifesto1/ (last visited Oct. 3, 2025).

[29]    *Our History*, AHA, https://americanhumanist.org/about/our-history/ (last visited Oct. 2, 2025).

[30]    *Humanist Manifesto I*, *supra* note 28.

Today's Humanism is not as commonly framed in expressly religious terms,[31] but it functions as a religion in the way that implicates the Religion Clause. It is a comprehensive belief system with a metaphysical and epistemological viewpoint that addresses fundamental questions, like: Why are we here? What is the meaning of life? How did we come to exist? What is the proper way to live? The lifestance of Humanism—"guided by reason, inspired by compassion, and informed by experience"—affirms people's "ability and responsibility to lead ethical lives of personal fulfillment that aspire to the greater good of humanity."[32] Humanism provides a framework to guide people's understanding of life and their actions within it, without relying on supernaturalism or a reality outside of the material world.

The Humanism espoused by AHA has a formal structure akin to many religions, with chaplains and other clergy (usually called celebrants), and entities dedicated to the practice of Humanism. AHA's

---

[31]    This is a byproduct of the type of definitional disagreements present in this litigation, not a fundamental difference in what Humanism means or what Humanists do.

[32]    *Humanism and Its Aspirations: Humanist Manifesto III*, AHA, https://americanhumanist.org/what-is-humanism/manifesto3/ (last visited Oct. 3, 2025).

adjunct organization, the Humanist Society, endorses and trains Humanist celebrants, chaplains, lay leaders, and invocators to conduct observances across the nation and worldwide, including weddings, commitment ceremonies, memorial services, baby namings, and other life-cycle events. Additionally, many Humanists find fulfillment in regularly congregating with one another. A primary focus of the AHA is to form and sustain local Humanist groups—where people can meet in community, celebrate Humanist holidays, contemplate metaphysical and epistemological questions at the core of religious philosophy, engage in charity, and build a legacy that makes our world a better place.

As with any belief system, groups and individuals within the Humanist tradition have differing views. AHA and CFI, for example, diverge on the issue addressed here—whether Humanism is, or can be, a religion.[33] Some Humanists reject the label of "religion" because they understand that word to reference belief systems premised on God or other supernatural suppositions, which conflict with their rational and

---

[33]     Paradoxically, if CFI were found to be a religious organization, it would be entitled to the church autonomy doctrine's requirement that courts not challenge its doctrine—and a central tenet of CFI's doctrine would likely be rejecting the label of religion.

scientific principles. Other Humanists embrace the term "religion"—because their understanding of its meaning is different, they think about it in a congregational context, or for other reasons. AHA understands and respects the choice of Humanists to adopt—or not—the "religious" label in their day-to-day lives and common understanding. But when assessing the term "religion" in the context of the First Amendment, it is critical—to protect the rights of not only Humanists but people of other faith groups and persuasions—to apply the legal understanding of those terms.[34] From the standpoint of the Religion Clause, some forms of Humanism are religions *and* need not be characterized as such by their adherents. *Cf. Welsh*, 398 U.S. at 341 (noting that, because most people are not aware of the broad legal meaning of "religious," a person's "statement that his beliefs are nonreligious is a highly unreliable guide").

---

[34]    It is not uncommon for a word to have a legal meaning that differs from its colloquial one. For example, "person" denotes a human being in common usage, but also connotes a corporation under the law; the legal definition of "vehicle" can include bicycles and boats; and "residence," as used colloquially, typically means "domicile" in a legal setting.

### B.  At Least in Some Instances, Humanism Satisfies the Legal Definition of Religion.

A Constitutionally recognized religion is a belief system that occupies in the life of the adherent a place parallel to that filled by a belief system based on the traditional notion of God. *See Seeger*, 380 U.S. at 176. This functional definition eschews theism as a component of religion by embracing belief systems that resemble theistic ones as to how they operate in a person's life. The Supreme Court has provided little, if any, guidance regarding how courts should determine whether a belief system occupies a parallel place. But lower courts have. Under the most common understanding—a factor test from the Third Circuit—at least some forms of Humanism are religions.

The *Africa* test looks at three factors of a proffered belief system:

1. Whether it addresses fundamental and ultimate concerns—i.e., "questions having to do with, among other things, life and death, right and wrong, and good and evil" or "theories of man's nature or his place in the Universe." *Africa*, 662 F.2d at 1033.

2. Whether it is broad and comprehensive: "A religion is not generally confined to one question or one moral teaching" or "a number of isolated, unconnected ideas." *Id.* at 1035.

3. Whether it has structural characteristics of accepted religions— e.g., "formal services, ceremonial functions, the existence of clergy, structure and organization, efforts at propagation, [and] observance of holidays." *Id.*

The Texas Third Court of Appeals applied this test to the form of Humanism embraced by the Ethical Society of Austin—an Ethical Culture congregation—and concluded that it is a religion. *Strayhorn*, 110 S.W.3d at 468-72. On the first factor, the court found that, despite not embracing theism, the belief system addressed the kind of fundamental and ultimate concerns that are central to religion. Adherents adopt "a commitment to an attempt to discover, through observance and debate, the transcendent moral truths that underlie human experience." *Id.* at 470. The second factor was satisfied because the belief system "create[s] a comprehensive response to the problems faced in life based on a common contemplative practice." *Id.* at 471. It "is not merely a disassociated string of ethical commitments, but a commitment to a particular discipline of spiritual observation." *Id.* That Ethical Culture has some structural characteristics of traditional religions—e.g., clergy, literature, regular meetings, ceremonial practices—lent further support for the court's conclusion that its form of Humanism is a religion. *Id.* at 471-72.

Other forms of Humanism undoubtedly satisfy this test as well. Even prior to *Seeger* and *Africa*, two courts had recognized forms of

Humanism as religions. The Supreme Court in *Torcaso* cited these cases in its footnote that identified Ethical Culture and Secular Humanism as non-theistic religions.[35] *See Torcaso*, 367 U.S. at 495 n.11 (citing *Wash. Ethical Soc'y*, 249 F.2d 127 (examining "Ethical Culture") and *Fellowship of Human. v. County of Alameda*, 315 P.2d 394 (Cal. Dist. Ct. App. 1957) (examining "humanism" and observing that it is "substantially similar" to Ethical Culture)).

Amici do not opine on whether CFI's form of Humanism satisfies *Seeger* or *Africa*. Amici's purpose is simply to illustrate that, despite its non-theistic nature, Humanism is within the ambit of the Religion Clause. Where a person derives meaning in life and deeply-held ethical imperatives from a comprehensive metaphysical and epistemological framework, that belief system is a religion even if it does not embrace a

---

[35]     Although this conclusion may be dictum, this Court is "generally bound by Supreme Court dicta." *See, e.g.*, *United States v. Peterson*, No. 24-30043, 2025 LX 387378, at *16-17 (5th Cir. Aug. 27, 2025). Though it is not "recent and detailed," *id.*, other considerations weigh in favor of its binding nature. For one, by citing *Washington Ethical Society* and *Fellowship of Humanity*, the *Torcaso* Court indicated that it supported their conclusions that the forms of Humanism they examined are religions. Humanism was also discussed during oral argument in *Torcaso*. Oral Argument 1, 00:04:29-00:05:05; Oral Argument 2, 00:53:04-00:54:20. Far from being an afterthought in a footnote, Humanism was top of mind for the Court.

belief in God. For some, Humanism undeniably meets this standard. These adherents are similarly situated to adherents of theistic religions, and failing to treat them as such would violate free-exercise principles, establishment principles, and fundamental equality principles. The Constitution demands equal treatment.

## CONCLUSION

The Court should remand the case to proceed on the merits. Whatever disposition it takes, however, it should correct the district court's erroneous rulings that theism is a condition for coverage by the Religion Clause and that Humanism cannot be a religion.

Respectfully submitted,

Courtney Miller
HWG LLP
1919 M Street NW, Eighth Floor
Washington, D.C. 20036
202-730-1300
cmiller@hwglaw.com

Amitai Heller
American Humanist Association
1821 Jefferson Place NW
Washington, D.C. 20036
202-238-9088
aheller@americanhumanist.org

*Counsel for Amici Curiae*

## CERTIFICATE OF RULE 32(G)(1) COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), because, as determined by the word count feature of Microsoft Word, it contains 6,458 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

I further certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

_____
Courtney Miller
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that, on October 6, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Courtney Miller
*Counsel for Amici Curiae*